Good morning, your honors. Daniel Gonzalez on behalf of the appellant seated with me at council table is my partner, Stephen Fleischman. Your honors, if I may, I'd like to begin this morning by discussing reasons why the jury's Ponzi scheme finding that Gerald Pressman was running EPD as a Ponzi scheme cannot stand, including the jury's failure to consider Pressman's state of mind because of instructional error, the absence of evidence that Pressman misled or deceived investors, and the other side's failure to show that Pressman's investments that EPD had helped finance were not legitimate profit-making opportunities. Now, a Ponzi scheme, as we know, is a form of financial fraud, and like any actual fraud, the scheme implicates the operator's state of mind, in this case, Pressman's knowledge, concerning which the district court refused to instruct the jury. Mr. Gonzalez, can you point me to any case that has instructed with a mens rea requirement for a Ponzi scheme operator? Well, I cannot say where – I guess the answer is no. The answer is no. I can't say that I found a case where there was found to be instructional error, but – and courts use objective factors to determine the existence of a Ponzi scheme. And once those factors are determined by the fact finder, it's presumed that the actual intent is met. Why does that then require, in your mind, an additional instruction as to knowledge that the Ponzi scheme would fail or some other fraudulent intent requirement? Well, I think, Your Honor, the premise to the Ponzi scheme presumption, which I understand, is an objective inquiry. The premise to that is that the Ponzi scheme operator knows that the scheme will eventually collapse. It is – and the Ponzi scheme presumption is based on the reasoning that knowing that the Ponzi scheme is eventually going to collapse, that the operator's intent to defraud or harm or deny recovery by those creditors left standing at the end of the scheme, that his intent is to defraud those individuals. Isn't a Ponzi scheme inevitably going to collapse? There's a limited number of investors. The premise behind the Ponzi pyramid scheme is that it can only be sustained so long as you find new investors to transfer their investments to the older investors. And so as numerous courts have pointed out, by definition, it's going to collapse. So isn't it intrinsic to someone knowing that they're running a Ponzi scheme is knowledge that that Ponzi scheme is going to eventually collapse? Well, if they know that what they're running is a Ponzi scheme, one can infer, Your Honor – I think what Your Honor's driving towards is that one can infer knowledge from the very nature of the scheme. Bernie Madoff, I mean, there was no question he knew what he was doing because he was, first of all, misleading his investors, and he was taking their money, purporting to invest them in money-making funds, and instead he was putting it in a checking account and then using those funds to repay earlier investors. So knowledge can be inferred from the very nature of the Ponzi scheme. Is it possible to inadvertently run a Ponzi scheme? Well, I guess if this is – if what the other side has alleged in this case is a Ponzi scheme, then it was – he was borrowing money from individual lenders as he had been doing for decades, and he was using that money to invest in business ventures and projects. And I understand that, but you're arguing against evidence that the jury did not find persuasive. So the jury found that there were objective factors that indicated that there was a Ponzi scheme being run, and your argument is that there should be this additional knowledge requirement of some kind, which I'm still unclear about, in order to formalize the finding of a Ponzi scheme. And I'm having trouble with that one. Either someone doesn't know they're running a Ponzi scheme or they don't know that the Ponzi scheme is going to eventually collapse, and I'm not sure that that reflects any circuit authority, much less our circuit authority. Well, I – Your Honor, I think that if I understand Your Honor correctly, one can inadvertently run a Ponzi scheme that – but it really depends upon the circumstances of the case. You know, Ponzi schemes do come in many different flavors, as the cases show. But this is a case where someone borrowed money and invested it. And not only did he invest the money, it returned millions and millions of dollars to the – to EPD. You know, I think really the question that this case presents at its core is, how do you distinguish simple refinancing of a loan, which is what the other side said Mr. Pressman did from time to time, they can't say how much, over the course of seven years, how do you distinguish simple refinancing of a loan from a debt of a loan from a Ponzi scheme? And in this – in Treadwell, this court observed, quote, what sets Ponzi schemes off from more intricate swindles is this, the money that investors put up isn't invested in anything, and the, quote, profits, close quote, are paid out of new money from subsequent investors. Just recently, in Winkler v. McCloskey, this court echoed its earlier characterization of Ponzi scheme investments as an illusion. Now, you know, looking to the other side's evidence, I mean, Jeremiahson was their expert, and neither Rund, the trustee, nor Jeremiahson tried to show that any of Pressman's investments that EPD helped finance were an illusion. Jeremiahson said he had no opinion whether the investments were legitimate, but his cash-in and cash-out analysis showed that they were legitimate. They returned $33.5 million in cash to EPD. But there was also evidence from Jeremiahson that the new funds were the only way that old investors could be sustained, old lenders. And I take your point, you're disputing that, and there's competing evidence, but on a sufficiency of the evidence to support a jury verdict standard, we're looking at whether there's adequate evidence to support the verdict. Well, Your Honor, Jeremiahson's opinion that, and I mean, he said that only some of the new borrowed funds was used to repay prior lenders. He didn't know how much. But his data showed that there was $33.5 million that came into EPD from Pressman's investments. I mean, that was money that was available to pay creditors. All of it went into one single pot, EPD's checking account. Can I – do you mind if I ask you a different question? Sure. Both sides have argued that – and I'm going to use Ann and John's name just as a first name for simplicity. Yes, thank you. Both sides have said that Ann was a non-party to the proceeding, again, to the trial for fraudulent conveyance by John. But the district court seems to have a different point of view, that Ann has always been a party to the adverse actions. Why is she a non-party to this if there was just a bifurcation of the trial as to John versus as to the BC Trust? Was your question why she is a non-party or? Why do you believe she was a non-party to John's – to the proceeding involving the trial of fraudulent conveyance by John? Well, she was a non-party because she didn't participate at the trial. I mean, the defense opposed bifurcation of the claims against John and Ann. The defense would have been happy to have the claims against both them and the BC Trust, of course, resolved in the district court. But the court bifurcated the claims against John and Ann. The case went to trial against John alone. And ultimately, the court then returned the proceeding, the case, to the bankruptcy court for determination of Ann's claim. And Ann testified. So she participated to some extent in those proceedings. Well, she's participated in the adversary proceedings. She did not participate at the trial. She did not testify at that particular trial. Oh, I think she did very briefly. Okay. But she didn't say anything of substance. In fact, if I may, Your Honor, she really didn't have much to say. This really is the case has to do with John and his conduct. This is what I'm stuck on a little bit. NITCO says that in order to mount a challenge to the sufficiency of the evidence against the jury verdict, there has to be a Rule 50A pre-verdict motion and then a Rule 50B post-verdict motion, which neither John nor Ann raised. And NITCO has a very clear bright line rule that if the party does not do this, we're barred from even considering such a claim. We wouldn't even hear it under plain error review. As I understand it, Ann seems to be using objections made by John in that proceeding to preserve challenges for jury instructions. For example, or to challenge objections to the use of the trustee's experts, demonstratives. Why can she piggyback onto those objections, for lack of a better term, but then be excused from the fact that John didn't file a Rule 50B motion post-trial in order to preserve this challenge on appeal? Well, Your Honor, John had no reason to file a Rule 50B motion. He won based on the jury's other findings. As far as John was concerned, that Ponzi scheme finding meant nothing to him. But be that as it may, and I understand why he didn't do it, why does that excuse you from the bright line rule that NITCO provides? That if the party does not file a Rule 50B post-verdict motion, you're absolutely barred from making a challenge on appeal. I understand John's reasons for not doing it, but why should Ann be allowed to pursue this on appeal when John didn't? Well, Ann could not file a Rule 50A motion because she wasn't a party at the trial. Her claims against her had been bifurcated. Not having filed a Rule 50A motion, she couldn't renew that motion under Rule 50B, which is what Rule 50B talks about, renewing a 50A motion. But John did file a Rule 50A motion, or he moved. So why not say, okay, I'm piggybacking onto this, and now I'm going to file a Rule 50B motion when the judgment comes in? Well, Your Honor, I'm not sure how that works. John files 50A and another party files Rule 50B. I don't think that's what NITCO contemplates. But then if that's the case, then why should we consider the jury instruction preserved either? Because it was John making that objection, not Ann. Well, that's true. But, I mean, the question is what — I'm trying to understand how we can have it both ways, I guess. This is a very unusual procedural posture. I was on another panel where we had to wrestle with that as well. So these seem to come up in this area of litigation with these parties. How are we able to square both of those things at the same time? Well, I think the problem is neither John nor Ann knew how this Ponzi scheme finding was going to be used against the B.C. Trust until the case went back to the bankruptcy court. The bankruptcy court was the one that said that the finding of a Ponzi scheme will be binding on the trust, and as a result of that, the trust will not be entitled to interest on its claims. Now, that wasn't something that was apparent during the trial or after the trial or while the case was in district court. But could the bankruptcy court have disregarded the jury's findings as to a finding of the existence of a Ponzi scheme? Could it have done otherwise? It certainly could, I think, have disregarded the finding of the Ponzi scheme because that was of no significance to the judgment that was ultimately entered in favor of John. Had that Ponzi scheme finding been significant to John, then he would have filed a notice of appeal from the judgment. But as it is, neither he nor Ann had any reason, any reason at all, after the jury verdict came in, to challenge that finding. It was something the jury found, for whatever reason, and we think because of error in instruction, and we think it was not supported by the evidence. And then we find out months later, a year later, I think, that it's going to be used against us. And at that point, Ann becomes aggrieved, and she's got to challenge that finding. The finding arose in the context of the trial against John. Judgment was entered in favor of John because, of course, he was entitled to it. And at that point, Ann had to seek review. Otherwise, the other side would be arguing, hey, you've waived your right to review. I've monopolized the questioning, so let me see if my colleagues have some. Shift gears. It's taken me a while to figure out what's really at stake here, so let me offer up what I think is at stake here and let you set me straight if need be. Is at stake here the question of whether Ann or the B.C. Trust can claim and obtain interest on the funds over the past whatever the time period would be? And if so, how much money are we talking about? Well, I can't give a precise answer to your second question, and I do believe that at its core the problem is that the court has ruled that the Ponzi scheme finding will, as a result of the Ponzi scheme finding, the trust will not be entitled to interest. Furthermore, the other side has already indicated that they are going to use that finding against the trust at the upcoming trial for equitable subordination of the trust's claim. So the trial- So is it not just the interest? Is it also the principle of the loans? Well, I guess, yes, yes, in a sense, because if they're equitably subordinated, then, of course, the trust will not-I mean, their claims will be subordinated.  Huh? How much are the loans? John Kirkland lent E.P.D., lent Pressman $2 million. And all of that is in the trust? Yes. All of it was assigned to the trust. It's a family trust for the benefit of their children. Although, as I understand it, Ann's filed three claims each for $2.6 million. So her claim is for around in the neighborhood of $6, $7 million. No. Not really, Your Honor. I believe that there were a lot of filings, I think, when the bankruptcy proceedings began, and I think the bottom line is the principle, the amount that he actually lent, was on the order of $2.1 million. But, of course, that was back in 2000 and-between 2007 and 2009. So the delta, the difference is more the interest that's accruing on- Yes, yes. Well, I mean, there would be that difference. Correct. Your Honor, I- You've gone over, but we'll give you a little time for rebuttal unless my colleagues have other questions. Thank you very much, Your Honors. Good morning, Your Honors, and may it please the Court. Corey Weber on behalf of Jason Amron, Chapter 7 trustee. I'd like to focus my comments on what the Court was inquiring about earlier. First, Judge Sanchez, you mentioned the NITCO holding by the Ninth Circuit. It's the trustee's position that both under NITCO and also under Unitherm, the Supreme Court case that NITCO refers to, this is procedurally barred. I think NITCO refers to it as a procedural default. But how could it have been a default? When could Ann, I guess we're calling her Ann, have done anything? Well, Your Honor, she did do something. First, she did not file the Rule 50B motion, which she could have since there was a motion filed during trial. But the second was Ann did file, and don't mean any disrespect by referring to her as Ann, but simply because the Court referred to her that way. But she did file a post-trial brief in the District Court, and the post-trial brief didn't talk about any error by the jury. It said the jury has spoken. The way that the jury ruled is dispositive of all the claims, and you should rule in our favor. So what she did was the opposite of the Rule 50B motion. She said she fully embraced the jury's findings. But at that time, she didn't know what use the bankruptcy trustee was going to try to put the verdict to. And so, I mean, I look at what the District Court did trying to figure out the practicalities here and understanding that, I mean, the first time I looked at this case, I'm saying, where's the final judgment against Ann? Oh, we're in bankruptcy. The rules are all kind of different in bankruptcy. You have things like Ann's case being controlled by the finding in John's case, even though Ann was told by the District Court that we're separating them and so forth. That's just how things are done in bankruptcy court. So I look at that, and I say, well, she has to have some opportunity to protect her interests. She wasn't allowed to be part of the trial. Well, the District Court bifurcated that, but says it gets applied in the bankruptcy court. So what justification is there in saying she can't object when it finally comes to affect her interests? So the finding for a Ponzi scheme was something that actually Ann's joint counsel, along with John, requested at the jury trial. And the reason why they requested it is they intended it to be implied as to the rule, as to the claims against her later on for her benefit. It didn't work out that way. The jury, after hearing about six days of evidence. I may have misunderstood you. You're saying John wanted that finding? Because as I look at the record, there was serious resistance to the proposition that Pressman was engaging in a fraud. No. Your Honor is correct. He didn't request that the jury outcome be that it was a Ponzi scheme because he claimed it wasn't. But he requested that the court include that in the special verdicts forms, that the jury have a determination as to whether it's a Ponzi scheme. And then after hearing the evidence, the jury did, about six days of evidence, the jury did determine it was a Ponzi scheme. Mr. Weber, did I hear you correctly when you said that? And I also mean no disrespect by using the first names. That Anne herself filed a post-trial motion? Correct, Your Honor. So explain that for me because I just heard counsel say that she was not a participant in these proceedings. Is that your view as well, that she was not a participant? Well, the claims against Anne were bifurcated. But together with John, they together filed a joint post-trial brief, and the brief was filed by their joint counsel and included both of their names, stated both of their positions repeatedly, saying things like the jury has spoken, it's dispositive of all the claims against Anne, and so it was their joint position. And so if she truly claims I can't file a Rule 50B motion, NICCA doesn't apply, why is she then filing a post-trial brief saying the jury has spoken? This is dispositive of everything. It doesn't fit together. The district court didn't accept that proposition. No, Your Honor. It sent Anne's case back to the bankruptcy court. So that's where it gets litigated. And I still don't understand why she shouldn't have an opportunity to litigate it there, which now means here. Well, the claims against her that are being litigated in the bankruptcy court are, first, they're fraudulent transfer claims that were resolved on summary judgment, and the remaining claim is for equitable subordination that will go to a bench trial. But the issue here is that she's presented as, whether it's a Ponzi scheme, an under-applicable Ninth Circuit authority, authority that the Kirklands have both cited in their briefs before the bankruptcy court, the jury's findings are binding. The jury found that it was a Ponzi scheme. Which is why we're here being asked to examine the basis for the jury findings. Let me pose that question to you. Did the district court's instructions inform the jury it needed to find fraudulent intent on the part of the promoter in order to find a Ponzi scheme? I'm not sure I follow. Did the instructions inform the jury that it needed to find fraudulent intent in finding that it was a Ponzi scheme? It did, Your Honor. Where? So the intent, it talks about the actual intent to hinder, delay, or defraud creditors, and there is a separate jury instruction that says that if the jury finds that it's a Ponzi scheme, that actual intent is established. Well, see, that's the problem I have here. My view, obviously, is somewhat different from Judge Sanchez's. I understand the inference being permitted from the finding of certain facts, but that's an inference or a presumption. It's not an irrebuttable presumption. And as I look here, I don't see where the jury was ever asked to focus on that question. There doesn't seem to be much doubt that there is some form of intent or mens rea requirement. Even the instruction given by the court made reference to how just the fact that the company's lost money for several years doesn't mean it's a Ponzi scheme. And when you have what has been an ongoing operation for many years with many actual assets, which Mr. Gonzales sought to distinguish from the more better known, the Brady-Madoff type of schemes, I don't know that the jury was actually told that it needed to find anything on the part of the intent of the promoter. And if you can point me to something where it was told that, I would appreciate it. Your Honor, there is no mens re or intent requirement under Ninth Circuit law. Stop. Based on what? Because I don't think that's the case. I'll tell you, Your Honor. So it's based on several Ninth Circuit cases. Well, I've looked at lots of the cases. All of them recite what a Ponzi scheme is. None of the cases I've looked at indicate that there's no intent requirement. And none of the cases I've looked at speak of instructions to a jury. Now, the problem, which Judge Sanchez pointed out in talking to your colleague, I don't find cases anywhere focused on the particular kind of problem we have here. But if you're going to point me to something that says it's an irrebuttable presumption, I'd be interested in finding it. If I can point the Court to several citations. The first is the Ninth Circuit's Agricultural Research and Technology Group case, 916 F. 2nd, 528. This site is at, I believe, page 536. As previously noted, the mere existence of a Ponzi scheme, and this is the critical part, which could be established by circumstantial evidence, has been found to fulfill the requirement of actual intent on the part of the debtor. That's exactly what I focus on. Because it does not say that there's not a requirement to find intent. It says it can fulfill the requirement of actual intent. But I don't see where the jury was told, okay, if you find all these various pieces, you can infer intent. And it can't be that it's automatic because it says infer. And if I can point the Court also to other statements. Stop, stop, stop. So you point out your best example, and I look at it, and to me it points the other direction. It says it's an inference. But I don't see where the jury was told where to draw the inference or what's required to draw that inference. Instead, I see a description of what a Ponzi scheme is, an acknowledgment that losses for several years doesn't mean it's necessarily a Ponzi scheme, and it's a financial fraud. But where is the jury told about the intent requirement needed to find fraud? You can infer that, but you have to infer it. From circumstantial evidence, Your Honor. But where were they told that? Where were they told that you could infer fraud from circumstantial evidence? I believe it's, let me just grab the verdict for me, Your Honor. Does Agritech use the word infer in that line you read? It doesn't. It can be established by circumstantial evidence, not inferred. And the circumstantial evidence doesn't point to any type of mens rea requirement, just the opposite. The Ninth Circuit cases talk about this is in the agricultural research case. Are you saying that a showing of fraudulent intent is not required to find a Ponzi scheme? Fraudulent intent by the debtor, which can include the mere fact of owning a Ponzi scheme. We're talking about the promoter. A Ponzi scheme is the intent of the promoter. And are you telling me that there's no requirement of any fraudulent intent on the part of the promoter to find a Ponzi scheme? That's correct, Your Honor. Based on what? There is no. That is way, because it's fraud. And you can't have fraud without some requirement of intent. Well, Your Honor, could I read you a few citations to Ninth Circuit case on that issue? Well, let's see if it gets any better than the first one. So in the agricultural research case. Oh, that is the first one. Where are you going to now? This is the same case but a different citation. It says the fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where, in fact, no such opportunity exists. And similar statements are made in Dinell v. Cowell, 533 F3rd 762 at 767. Do any of those purport to outline the elements required to establish fraud? Or do they simply describe how a Ponzi scheme works? What the fraud is in a Ponzi scheme. So you don't have to have any kind of fraudulent intent to find a Ponzi scheme. If, in fact, you're losing money and so you're paying out money that's come in from new investors. So how do you square that with the last sentence of the instruction given? It's the mere operation of the Ponzi scheme that provides the intent. See, that's sort of a self-fulfilling prophecy because if you call it a Ponzi scheme, you've concluded it's a financial fraud. But if you unpack financial fraud, you have an intent requirement. And my concern here is I don't think the jury was ever told that it needed to decide, based on the circumstantial evidence, whether there was, in fact, a financial fraud here. And you haven't pointed me to anything that shows me where the jury was told to make that inference or that it didn't have to make that inference, but it was something they were supposed to conclude based on the evidence. I don't think that there is any type of an intent requirement, Your Honor, at least under Ninth Circuit law, and certainly I've never seen any. And it's just the opposite. It's circumstantial evidence. Wait. What's the circumstantial evidence supposed to lead to? It is supposed to lead to an inference of a Ponzi scheme, an inference of fraudulent intent. The circumstantial evidence itself doesn't define the scheme that's deemed to be fraudulent. It's an indicator. It's a basis you can infer. It's circumstantial evidence. You're telling me that you don't have to have any fraudulent intent? Somebody that operates a business that loses money every year, he has a fraudulent intent? By definition, it's an irrebuttable presumption? If the Ponzi scheme operator is taking money from Investor A and paying it to Investor B in an attempt to make it look profitable? If that's all he's doing, but suppose he's running lots of businesses and he has losses for several years. Well, there were other businesses. All of them were unprofitable. All of them were insolvent. And this isn't something that was just the thoughts of Tom Jeremiahson, the trustee's expert. The Kirkland's expert testified at trial. This is at 6 ER 1353. On reading deposition testimony for impeachment, in your opinion, did EPD use money coming in from investors to pay other investors? Answer, it appears some of that went on. During what period of time? Answer. Well, the time of Mr. Jeremiahson's report is 2003 to 2010. So he speaks to that in his report and in some of his exhibits, particularly Exhibit 4 questions. So it's your understanding that EPD did use money from investors to pay other investors? Is that right? Answer, it appears that that may be so. So let me make sure, because I'm taking up your time. I understand your position. You are not arguing that the jury was told that it could infer intent required for fraud from the circumstantial evidence. Your position instead is that there's no requirement to establish any fraudulent intent in order to find there's a Ponzi scheme. I don't recall the exact statement in the jury instructions, but I could pull it, Your Honor. I just don't recall what Judge Fischer put in there. Well, I don't. I mean, that's what I look for, and I think that's the question I started with. Where was the jury asked to find any level of intent in finding there was a Ponzi scheme? And I didn't find anything. There was a specific jury instruction on Ponzi. Yeah, a Ponzi scheme is a financial fraud that induces investment, so on and so forth. Right. But so point me to something in there that tells the jury it has to find some form of intent, and your position seems to be that the law doesn't require that. Can I, the paragraph immediately preceding, of proving a fraudulent transfer, EPD and Pressman's actual intent to hinder, delay, or defraud creditors, is established if plaintiff proves that EPD operated as a Ponzi scheme. So it seems to me when you read the jury instruction, it's saying if you meet the objective criteria in the following paragraph of the existence of a Ponzi scheme, that establishes an intent, an actual intent to hinder, delay, or defraud, which is consistent with Donnell, which says the mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud. So it's the actual intent is an element, but it can be established by the finding of the circumstances of a Ponzi scheme. That's correct, Your Honor. And if you look at the Judge Fisher's jury instruction on what comprises a Ponzi scheme, and you compare it to the two definitions in the Agricultural Research case of the Ninth Circuit and also the Donnell v. Cowell case in the Ninth Circuit, they're almost exact. There are slight differences because each of the Ninth Circuit opinions and other courts' opinions on what constitutes a Ponzi scheme were all slightly different, but generally the same. If you look at the court's jury instruction, it's almost spot on what Donnell v. Cowell and also the Agricultural Research case said. Which didn't involve jury instructions. But it did define what a Ponzi scheme is. And just wrapping up, Your Honor, so going past whether the claims that are here today are barred by NITCO, there was overwhelmingly sufficient evidence presented at the court trial as to EPD being a Ponzi scheme. There was significant evidence of commingled investor monies. Not only the experts testified about that. Ruben Moreno, the controller, testified about all the money going into one pot. Mr. Pressman said he couldn't differentiate as to whether one investor got their own funds versus other investment funds. There was unanimous concurrence by Ruben Moreno, the controller, and also by both experts that there were continuous net losses by EPD from 2003 to 2010. Every single year there was a net loss. Every year liabilities were greater than assets. This wasn't some business that was generating any funds. There was evidence presented of extremely low bank balances. Mr. Pressman testified during 2009 EPD had around $5,000, negative $5,000 at the low end to $200,000 at the high end. This is for a business that has $50 million to $70 million in liabilities. For 2010 there was something in the range of $241 or less on hand July to December 2010. There was also testimony about interest being paid to investors despite absolutely no net profits. Ruben Moreno, the controller, testified that investors received between 6% and 12% interest per year, but even the Kirkland's expert testified there were never any net profits. Liabilities were greater than assets. Okay. Do you want to make some concluding remarks? Yes, Your Honors. I don't think that there is a basis for an appeal here. I understand that Mrs. Kirkland wants interest on what she claims is an amount owed to her from her husband, originally due to her husband, John Kirkland, but the arguments are arguments of convenience. Ms. Kirkland said that the jury had spoken when it fit what she thought she wanted. Now that the jury's conclusions are being applied as to the claims against her, she changed her mind, and the reply brief I think says something like the jury spoke, but it only spoke as to the issues that were favorable to us, not the ones that were unfavorable. That's sort of the tenor. And so these arguments are arguments of convenience. Similarly, the issue on lenders versus investors, you know, there's no there. The Kirkland's, her husband, John Kirkland, filed a brief in the bankruptcy court not a long, long time ago, saying these aren't loans, they're investments. Okay. Anything else? Nothing, unless there are any further questions, Your Honors. No other questions. Thank you. Thank you. Can you add five minutes for Mr. Gonzales, please? Thank you very much, Your Honor. Your Honor, it's very clear what the other side's position is with regard to state of mind. Mr. Weber told the district court at the trial that what was in Pressman's state of mind was irrelevant. Now, we know that the issue of Ponzi scheme very frequently comes up in the context of criminal prosecutions, and individuals like Madoff, though he wasn't actually prosecuted, he pled guilty, but still, it comes up in that context. And I don't think that this court would ever hold that state of mind was irrelevant to a criminal prosecution against someone alleged to have been running a Ponzi scheme. No, absolutely not. But bankruptcy operates in a different way and with different goals in mind. And an action for fraudulent transfer is meant to allow trustees to try to recover the transfer of assets to other creditors in order to help effectuate the purposes of bankruptcy. So I take your point. It happens in the criminal context, but explain to me why that element should be imported into what we have already established as a Ponzi scheme presumption of some kind. The fraudulent transfer statutes under state and federal law under which the bankruptcy court avoids these transfers talk in terms of intent, the intent on the part of the transferor to defraud the creditors. Well, the Ponzi scheme presumption kind of short circuits that by saying, well, we can infer the intent from the operator's knowledge that the scheme is going to collapse. The operator knows that the scheme will collapse. There will be creditors left at the end who will not be satisfied. Here, Mr. Pressman had, we think, overwhelming reason to believe that he was not running a Ponzi scheme. I mean, two of his businesses reported for tax purposes, and this is in the record, $24 million of revenue for the two years 2007 and 2008. Many of his businesses returned millions of dollars more to EPD than they received from EPD. Plus, I mean, I don't think it's insignificant. There's the $9.1 million that the Pressmans themselves put into EPD. Now, all of that money went into one pot, the checking account, and all of that money was available to pay creditors. And anyway, we've briefed that. But there's one other point I want to talk about with regard to the binding effect of the findings and the post-trial brief. During the trial, when John Kirkland's attorney asked for specific findings as to the Ponzi scheme, the insider status and good faith and equivalent value, he was entitled to ask that. I mean, I think a lot of courts have recognized the value of special verdicts, so you know what findings the jury relied on in order to return its verdict. And, of course, the court instructed the jury that it could infer, it could presume the intent to defraud creditors if it found a Ponzi scheme. Now, when that issue came up and John's attorney asked for these special findings, this was Mr. Weber's response at page 1256 of the excerpt of the record. No objection to including some question asking about a Ponzi scheme or insider. What plaintiff, that's Mr. Weber's client, Rund, would object to is including that in an attempt to make that binding on a court trial or some other deliberation of the claims against the B.C. Trust, since the B.C. Trust waived its right to a jury trial by filing proofs of claim. So plaintiff would be opposed to anything that would bind this court or a different court. Now, of course, they lost on the issues of good faith, equivalent value. Ah, but they won on Ponzi scheme. And why did they win on Ponzi scheme, we submit, because the jury wasn't instructed that if Pressman didn't know that his business model that he'd been operating for 40 years was going to collapse, then, you know, that he couldn't be liable for running a Ponzi scheme. That he had lots of reasons that we've explained to think that this business model, which had been successful for him, would continue to be so. Can I ask one final question? Sure. Could Ann have filed a post-judgment Rule 50B motion after the bankruptcy court entered judgment for John's trial? So I realize there was a delay in time, right? And so there was a post-trial motion that was filed, perhaps jointly filed. And then it gets sent down to the bankruptcy court. And the bankruptcy court has an order on summary judgment. And at that point, it becomes clear that the adverse finding by the jury about the Ponzi scheme is going to be applied in the bankruptcy court's own proceedings. Well, that then gets reduced to a, I think, if I understand the process, the judgment for John gets entered after that. Correct. So at that point, Ann is aware that the finding by the jury is going to be used adversely to her. Would that have been the right time, post-judgment, to file a Rule 50B motion? No, Your Honor, because she wasn't a party at the trial. And I believe that the other side in their brief acknowledged that she was not a party at the jury trial. She was not a party. She hadn't filed, couldn't file a Rule 50A motion. Accordingly, she couldn't renew the motion. Furthermore, the whole purpose of these Rule 50 motions is to allow the presiding judge, the trial judge, to evaluate the evidence, to bring the unique perspective as the presiding judge. And at that point, it's not in front of the district court anymore. And at that point, it's before the bankruptcy judge. And finally, I mean, you know, what she did was she took an appeal to the district court, which had presided over the trial, and presented the issue of sufficiency of the evidence. And the district court found she found that there was, in the court's view, sufficient evidence. I mean, it was the functional equivalent. Her appeal to the district court was the functional equivalent of a Rule 50B motion had one been required. But, of course, we don't think one has to be required. The post-trial briefs, we never conceded that every finding by the jury was binding. We were focusing on the findings that were favorable to John, which dictated judgment be entered in his favor, by which Rund was bound because he was a participant at the trial under normal rules of collateral estoppel. They could be used against him. He had a full and fair hearing on those issues and had not had a full and fair hearing on the Ponzi scheme issue. Okay. Thank you very much, Your Honors, for indulging me. Thank you both for your helpful arguments. The matter will stand submitted. Thank you.
judges: CLIFTON, SANCHEZ, Korman